IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SARA D. BRACKETT, | ) |
|    Plaintiff, | ) ) ) ) |
| v. | ) ) |
| COLLINSVILLE PUBLIC SCHOOLS a/k/a INDEPENDENT SCHOOL DISTRICT NO. 6 OF TULSA COUNTY, OKLAHOMA; ASHLEY BOOMER; JULIA CRUTCHFIELD; JACQUELINE JOHNS; JEREMY HOGAN; AMY DUNCAN; and SARAH ELLINGTON | ) ) ) ) ) ) ) ) ) ) |
|    Defendants. | ) |

Case No. 25-cv-00267-SH

**OPINION AND ORDER**

Before the Court are Defendants' partial motions to dismiss.[1] The motions are granted in part.

The Court finds Plaintiff has failed to allege abuse under the Oklahoma Children's Code, or that she was retaliated against after she made a report under that Code. Plaintiff's claim for unlawful discharge relies on the same statute and similarly fails. Plaintiff has failed to allege the school superintendent had the relevant policymaking authority, so her claim against the school district for unlawful search and seizure under 42 U.S.C. § 1983 is dismissed. Plaintiff's remaining claims have been adequately alleged.

*Factual Background*

Taking the factual allegations in the petition as true and viewing them in the light most favorable to the nonmoving party, Plaintiff alleges as follows: Plaintiff Sara D.

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a). (Dkt. No. 27.)

1

Brackett ("Brackett") began working for Collinsville Public Schools (the "School District") in August of 2023 as a paraprofessional at the early childhood center. (Dkt. No. 2-2 ¶ 13.) Brackett was assigned to assist Jennifer Rigdon, a teacher ("Rigdon"). (*Id.* ¶ 17.) By October 3, 2023, Brackett became concerned Rigdon "was committing physical abuse upon the children," and she began documenting Rigdon's conduct. (*Id.* ¶¶ 19–20.) Brackett reported the conduct to Defendant Ashley Boomer, the principal ("Boomer"); Jacqueline Johns, the district's Director of Special Services ("Johns"); and Amy Duncan, a Special Education Teacher ("Duncan"). (*Id.* ¶¶ 4, 6, 8, 20.) Brackett made additional reports to Principal Boomer through December 4, 2023, including providing photographs. (*Id.* ¶¶ 23, 25.) Boomer variously told Brackett, "just keep the kids safe; the District will handle it"; said they just needed to get to the end of the year, as Rigdon was not going to be renewed; told Brackett to stop taking photographs, as they had all they needed; and told Brackett to delete the files she had on the incidents. (*Id.* ¶¶ 21, 24, 26–27.)

Principal Boomer then assigned Brackett to be the teacher, while Rigdon became an aide to another teacher. (*Id.* ¶ 28.) By mid-January 2024, Brackett told Boomer she could not continue in the role, and Boomer continued to express that Brackett was keeping the children safe and the School District could not afford to go to court over child-abuse allegations. (*Id.* ¶¶ 29–35.)

Boomer then moved Brackett into another classroom to assist a different teacher. (*Id.* ¶ 36.) In May 2024, Brackett glimpsed a video that showed Rigdon handling a child roughly, allowing a gate to hit a child's head, and leaving the child crying. (*Id.* ¶ 39.)

In mid-May, Brackett was called to the office to meet with Jeremy Hogan, the district's superintendent ("Hogan"). (*Id.* ¶¶ 7, 40.) Hogan confronted Brackett about

allegedly leaving a note in a student's bag that said Rigdon had been abusing the child. (*Id.* ¶¶ 41–47.) After the meeting, Duncan and another teacher told Bracket that Defendant Sarah Ellington ("Ellington"), a district coordinator, was "going through" her stuff. (*Id.* ¶¶ 9, 49.) Brackett found Ellington in her work area, and Ellington admitted going through her phone. (*Id.* ¶¶ 50–51.) Ellington said she had done so at the direction of Superintendent Hogan, Director Johns, Principal Boomer, and Julia Crutchfield, the School District's Executive Director of Human Resources and Finances. (*Id.* ¶¶ 5, 51; *see also id.* ¶¶ 90–92.) Brackett later discovered that Ellington had deleted files from her phone, including a video of Rigdon's abuse. (*Id.* ¶ 52.)

Brackett then met with Principal Boomer, Director Johns, and Executive Director Crutchfield. (*Id.* ¶¶ 55.) Crutchfield told Brackett that her job was not "a good fit" for her and noted how Brackett had "so passionately" documented Rigdon's conduct. (*Id.* ¶ 56–58.) The parties also discussed their dispute as to whether Brackett had left the note regarding Rigdon. (*Id.* ¶¶ 60–61.) Brackett asserts the various actions taken by the individuals were harassment and intimidation, done in response to her internal reports of Rigdon's abuse. (*Id.* ¶¶ 74–75.)

The school year ended on May 17, 2024. (*Id.* ¶ 62.) Three days later, Principal Boomer informed Brackett that her contract would not be renewed for the 2024–2025 school year. (*Id.* ¶ 63.) Again, Brackett asserts this termination was in retaliation for her internal reports of abuse. (*Id.* ¶¶ 77, 86.)

Apparently at some point after her termination, Brackett filed a report with the Oklahoma Department of Human Services ("DHS") regarding abuse of disabled students.[2] (*Id.* ¶ 66.)

### *Procedural Background*

Brackett has brought suit against the School District and multiple individual defendants. (Dkt. No. 2-2.) Brackett asserts the following causes of action: (1) retaliation for reporting child abuse, in violation of the Oklahoma Children's Code, Okla. Stat. tit. 10A, § 1-2-101(B)(5)—against all defendants; (2) unlawful discharge under *Burk v. K-Mart Corp.*, 1989 OK 22, 770 P.2d 24—against the School District; (3) unlawful search and seizure in violation of 42 U.S.C. § 1983 and Okla. Const. art. 2, § 30—against all defendants except Duncan; and (4) civil conspiracy—against all defendants. (*Id.* ¶¶ 73–97.)

Defendants have filed partial motions to dismiss, seeking to dismiss Brackett's claims under the Children's Code, the claim for unlawful discharge, and the claim for civil conspiracy. (Dkt. Nos. 9 at 3–9; Dkt. No. 10 at 8–14; Dkt. No. 23 at 12–23.[3]) The School District also seeks dismissal of Brackett's § 1983 claim against it, while the individual defendants seek to dismiss any § 1983 claims brought against them in their official

---

[2] The petition does not state when this report was filed. However, the petition is generally constructed in chronological order, and the parties appear to agree in their briefing that this was after Brackett's May 20, 2024, termination. (*See, e.g.*, Dkt. No. 8 at 4 (noting the argument that Brackett has failed to state a claim because she "did not make a formal complaint to [DHS] . . . until after she was notified of the termination of her employment," but arguing this fact is irrelevant); *id.* at 5 (noting the "internal reporting" occurred prior to her discharge); *id.* at 7 (arguing the motivating factor behind her termination was retaliation for reporting the abuse internally and because she had made the abuse known to parents).)

[3] Page numbers refer to those in the court-provided header.

4

capacities. (Dkt. No. 9 at 9–10; Dkt. No. 10 at 3–5; Dkt. No. 23 at 7–9) The individual defendants also claim immunity under the Oklahoma Governmental Tort Claims Act, Okla. Stat. tit. 51, §§ 151–171 ("OGTCA"). (Dkt. No. 10 at 5–7; Dkt. No. 23 at 10–12.) Finally, the School District argues that punitive damages are not available as a remedy against it. (Dkt. No. 9 at 10–11.)

## *Analysis*

### I.   **Standard of Review**

To survive a 12(b)(6) motion to dismiss, "a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). All such reasonable inferences are resolved in the plaintiff's favor. *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013). But the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations and footnotes omitted); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation"), *quoted in Twombly*, 550 U.S. at 555. This is a "low bar." *Griffith v. El Paso Cnty.*, 129 F.4th 790, 815 (10th Cir. 2025).

## II.   Retaliation for Reporting Child Abuse

Brackett's retaliation claim fails for two essential reasons—(1) she did not report "abuse" as defined by the statute; and (2) even if she had, the alleged "retaliation" occurred before she engaged in any protected reporting activity.

### A.   The Child Abuse Reporting Statute

Brackett's claims arise under the Oklahoma Children's Code, Okla. Stat. tit. 10A, §§ 1-1-102–1-9-122.  *See* Okla. Stat. tit. 10A, § 1-101(A) (defining the sections in the Code). The intent of the Children's Code is to "provide the foundation and process for state intervention into the parent-child relationship whenever the circumstances of a family threaten the safety of a child and to properly balance the interests of the parties stated herein." *Id*. § 1-1-102(B).

In fulfillment of this purpose, the Children's Code provides that the "Department of Human Services shall establish a statewide centralized hotline for the reporting of child abuse or neglect to the Department." *Id*. § 1-2-101(A)(1) (2024).[4]  The Code further provides that, "[e]very school employee having reason to believe that a student under the age of eighteen (18) years is a victim of abuse or neglect shall report the matter immediately to the Department of Human Services and local law enforcement." Okla. Stat. tit. 10A, § 1-2-101(B)(2)(a) (2024); *see also id*. § 1-2-101(B)(1) (2024) (mandating that every person report such abuse to DHS).

The Code defines "abuse" as "harm or threatened harm to the health, safety, or welfare of a child by a person responsible for the child's health, safety, or welfare . . . ." *Id*. § 1-1-105(2) (2024).  Meanwhile,

---

[4] The Children's Code has been amended multiple times since 2024.

> 'Person responsible for a child's health, safety, or welfare' includes a parent; a legal guardian; custodian; a foster parent; a person eighteen (18) years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child; an agent or employee of a public or private residential home, institution, facility or day treatment program as defined in Section 175.20 of Title 10 of the Oklahoma Statutes;[5] or an owner, operator, or employee of a child care facility as defined by Section 402 of Title 10 of the Oklahoma Statutes[6] . . . .

*Id.* § 1-1-105(53) (2024).

Persons who make such reports are protected. "[N]o employer, supervisor, administrator, governing body or entity shall interfere with the reporting obligations of any employee or other person or in any manner discriminate or retaliate against the employee or other person who in good faith reports suspected child abuse . . . ." *Id.* § 1-2-101(B)(5) (2024). Brackett claims the School District and individual defendants retaliated against her under this statute.

### B.   Brackett Has Not Alleged Abuse Covered by the Children's Code

As a preliminary matter, Brackett has failed to show that this case involves the obligation to report child abuse under the Children's Code.[7] Brackett does not allege that

---

[5] A "day treatment program" means "nonresidential, partial hospitalization programs, day treatment programs, and day hospital programs in which children and adolescents are placed for psychiatric or psychological treatment." Okla. Stat. tit. 10, § 175.20(a).

[6] A "child care facility" is a "public or private child care residential facility, child-placing agency, foster family home, child care center, part-day program, out-of-school time program, day camp, drop-in program, program for sick children, family child care home, or large family child care home providing either full-time or part-time care for children away from their own homes . . . ." Okla. Stat. tit. 10, § 402(4). Child care facilities are licensed by DHS. Okla. Stat. tit. 10, § 405(A).

[7] The School District and Defendants Boomer, Johns, Hogan, and Ellington only raise this issue in their reply briefs. (*See* Dkt. No. 31 at 3–5; Dkt. No. 30 at 3–5.) Defendants Crutchfield and Duncan raise this in their motion. (*See* Dkt. No. 23 at 13–15.) Even so, all parties have had a full opportunity to brief this issue. And, in any event, all defendants are subject to dismissal under their timing argument, *see* section II(C), *infra*—an argument they all made in their original motions. (*See* Dkt. No. 9 at 6–7; Dkt. No. 10 at 11; Dkt. No. 23 at 19.)

Rigdon was a parent, guardian, foster parent, or other type of person covered by the Children's Code. *See* Okla. Stat. tit. 10A, § 1-1-105(53). She similarly does not allege that Rigdon was an employee of the sorts of residential care, day treatment facilities, or child care facilities listed in the Code and for which DHS provides regulatory control. *Id.* (*See also* nn. 5–6, *supra*.)

Brackett tries to avoid the statutory language of the Children's Code by pointing to the crime of child abuse under Oklahoma's criminal statutes. This argument fails for multiple reasons. First, Brackett cites case law noting that the "offense of Child Abuse . . . can be committed by '[a]ny parent or *other person*.'" *State v. Vincent*, 2016 OK CR 7, ¶ 11, 371 P.3d 1127, 1130 (quoting Okla. Stat. tit. 21, § 843.5(A) (2012)). (Dkt. No. 32 at 14.) And, it is true that, in 2012, Oklahoma's criminal statutes provided that "[a]ny parent or other person who shall willfully or maliciously engage in child abuse" shall be guilty of a crime. Okla. Stat. tit. 21, § 843.5(A) (2012). However, the criminal statute went on to define "abuse" as including both (1) abuse as defined in the Children's Code—i.e., that committed by a person responsible for the child's health, safety, or welfare; and (2) "the act of willfully or maliciously injuring, torturing or maiming a child under eighteen (18) years of age by another." *Id.*[8] This example does not demonstrate—as Brackett argues— that "any person" can commit reportable "abuse" under the Children's Code. Just the opposite. It emphasizes that the type of abuse reported under the Children's Code is more

---

[8] During the 2023–2024 school year, the criminal child abuse statute had been reordered, but similarly included two separate definitions for child abuse—that committed by the person responsible for the child's health, safety, or welfare, and that committed by an outsider. *See* Okla. Stat. tit. 21, § 843.5(A), (O)(1)(a)–(b) (2023). The criminal statute also contained its own definition of "person responsible for a child's health, safety or welfare," one that contains more examples than that in the Children's Code. *See id.* § 843.5(O)(12) (2023).

limited than any abuse by any person.[9] *See Russell v. Chase Inv. Servs. Corp.*, 2009 OK 22, ¶ 20, 212 P.3d 1178, 1185 ("[The Oklahoma Supreme Court] construes statutes to avoid rendering any language superfluous.").

Second, Brackett argues that school employees stand *in loco parentis* and, therefore, are similar enough to the exemplars in the statute to be an unlisted "person responsible for the child's health, safety, or welfare." (Dkt. No. 32 at 14–15.) Brackett's argument would expand the Children's Code far beyond its intended confines and ignores principles of statutory interpretation. That is, the Children's Code does not stop with just the hotline and reporting requirement. It goes on to address how DHS investigates allegations of abuse, takes children into protective or emergency custody, and terminates parental rights. *See, e.g.,* Okla. Stat. tit. 10A, chs. 2, 4. So, for example, after receiving a report of abuse, if "the Department determines that . . . the alleged perpetrator is someone <u>other</u> than a person responsible for the child's health, safety, or welfare," it immediately refers the matter to law enforcement and is not responsible for further investigation <u>unless</u> it has reason to believe, for example, that the perpetrator is the parent of another child. Okla. Stat. tit. 10A, § 1-2-102(B)(1)–(2) (2024) (emphasis added). When DHS conducts an investigation, it may interview a child at their school. Okla. Stat. tit. 10A, § 1-2-105(B)(1) (2024). If it does, DHS then notifies "the person responsible for the health, safety, and welfare of the child that the child has been interviewed at a school." *Id.* Such persons may also refuse to furnish the child's behavioral records to DHS and may contest when DHS seeks an order for those documents' production. *Id.* § 1-2-105(B)(3)–(4). If

---

[9] Brackett's arguments regarding Oklahoma's criminal child endangerment statute similarly fail, where the statute does not use the defined term "person responsible for the child's health, safety, or welfare." *See* Okla. Stat. tit. 21, § 852.1 (2024).

DHS believes "a person responsible for the health, safety, and welfare of the child may remove the child from the state before the investigation is completed," it may also seek a temporary restraining order. *Id.* § 1-2-105(G). The examples go on. The entire structure of the Children's Code is built around matters within DHS's purview and the custody of children. Whatever role a teacher may play during the school day, it would make the phrase "person responsible for the child's health, safety, or welfare" nonsensical if it included a teacher who does not play a similar role as a guardian and who is not an employee at one of the very specific listed facilities supervised by DHS. *See* Okla. Stat. tit. 25, § 2 ("Whenever the meaning of a word or phrase is defined in any statute, such definition is applicable to the same word or phrase wherever it occurs, except where a contrary intention plainly appears."); *see also Ghoussoub v. Yammine*, 2022 OK 64, ¶ 19, 518 P.3d 110, 115 ("Words used in a part of a statute must be interpreted in light of their context and understood in a sense that harmonizes with all other parts of the statute." (quoting *Matter of Est. of Little Bear*, 1995 OK 134, ¶ 22, 909 P.2d 42, 50)).

Finally, the legislature knew how to refer to a "school employee" when it wanted the statute to call them out specifically. It did so in the very reporting section at issue in this case. *See* Okla. Stat. tit. 10A, § 1-2-101(B)(2).

As alleged, Rigdon is not a person responsible for the health, safety, or welfare of school children, and the Oklahoma Children's Code does not apply. *See also Nation v. Piedmont Indep. Sch. Dist. No. 22*, No. CIV-18-1090-R, 2019 WL 4452953, at *4 (W.D. Okla. Sep. 17, 2019) (finding teacher does not meet statute's definition); *M.C. v. Hollis Indep. Sch. Dist. No. 66*, No. CIV-15-343-C, 2017 WL 1102680, at *6 (W.D. Okla. Mar. 23, 2017) (same regarding superintendent and principal); *Doe v. Oologah-Talala Indep. Sch. Dist. No. 4*, No. 21-CV-240-JDR-SH, 2024 WL 1357612, at *5 (N.D. Okla. Mar. 29, 2024)

(finding no alleged facts identifying an assistant basketball coach as a person who is responsible for a student's health, safety, or welfare).[10]

### C. Brackett Has Not Alleged Retaliation for a Report to DHS

Brackett's retaliation claims similarly fail because she does not allege that her dismissal—or any of the other harassment she alleges—occurred <u>after</u> she made a report to DHS or local law enforcement. That is, the protected activity in the statute is a school employee's report "to the Department of Human Services and local law enforcement" or a regular person's report "to the Department of Human Services." Okla. Stat. tit. 10A, § 1-2-101(B)(1)–(2)(a) (2024). Brackett does not allege that she contacted local law enforcement. (*See* Dkt. No. 2-2 ¶¶ 64–65 (alleging someone advised her to report to someone other than the local police department based on a belief they "would work to cover up for the School District").) Brackett <u>does</u> allege that she filed a report with DHS "due to the failure of Defendants to act in response to her reports of abuse" (*id.* ¶ 66), but she does <u>not</u> allege this occurred before her termination. Instead, Brackett argues that she suffered retaliation because of her <u>internal</u> reports to school officials and because she "made the abuse known to parents of the affected children." (Dkt. No. 18 at 7.)

Retaliation is not defined in the Children's Code. However, Oklahoma case law on retaliatory discharge makes clear that a plaintiff must prove that the retaliatory action

---

[10] Brackett argues that reliance on federal court interpretations of the Children's Code "is not helpful," because such holdings are not binding on the state courts. (Dkt. No. 32 at 14–16.) Brackett misses the point. When a federal court sits in diversity, applying state law, it must follow the most recent decisions of the state's highest court. *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007). Where there are no such decisions, the court must attempt to predict what the highest state court would do and may seek guidance from (1) decisions rendered by the state's lower courts, (2) decisions of federal district courts interpreting the state law in question, and (3) the general weight and trend of authority in the relevant area of law. *Id.* at 666.

occurred <u>after</u> the plaintiff engaged in protected activity. *See, e.g., Johnson v. St. Simeon's Episcopal Home, Inc.*, 2012 OK CIV APP 6, ¶ 7, 270 P.3d 197, 200 (requiring the discharge be "consequent" to the employer's notice). This accords with the plain meaning of the word retaliation as the act of retaliating, which means "to return like for like," especially to get revenge, or "to repay in kind." *Retaliation*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/retaliation [https://perma.cc/96MM-DZ5C] (last visited Jan. 30, 2026); *Retaliate*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/retaliating [https://perma.cc/A9MT-YKGP ] (last visited Jan. 30, 2026). The statute prohibits interfering with a person's reporting obligations or retaliating against them for reporting suspected child abuse. *See* Okla. Stat. tit. 10A, § 1-2-101(B)(5). Brackett has failed to state a claim for retaliating against her for exercising her reporting obligations under the statute, because she has not alleged that Defendants did anything to her after she actually exercised those obligations.

Brackett has failed to state a claim of retaliation under Okla. Stat. tit. 10A, § 1-2-101(B)(5).

### III. Brackett Has Not Stated a Claim for Unlawful Discharge under *Burk*

Brackett's claims against the School District under *Burk* fail for the same reason as her claims under the Children's Code. "The Burk tort remedy is a common law cause of action against an employer based on public policy violation that is available to an employee when there is no other adequate remedy to redress the violation." *Reynolds v. Advance Alarms, Inc.*, 2009 OK 97, ¶ 5, 232 P.3d 907, 909. This claim serves as an exception to Oklahoma's terminable-at-will doctrine and "must be strictly applied." *Id*. ¶ 6; *see also Barker v. State Ins. Fund*, 2001 OK 94, ¶ 14, 40 P.3d 463, 468 ("the *Burk* tort

is unique: it applies to only a narrow class of cases and it must be tightly circumscribed").

To plead a *Burk* claim, the plaintiff must allege:

> (1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma, and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal.

*Booth v. Home Depot, U.S.A., Inc.*, 2022 OK 16, ¶ 11, 504 P.3d 1153, 1156.

Brackett's claims fail at elements 4 and 5, because she relies entirely on the Children's Code as the source of the public policy goal being protected. (*E.g.*, Dkt. No. 18 at 4–5.) Brackett cannot satisfy the fourth element, because she has failed to allege that the public policy goals of the Children's Code are implicated in this case—where there was no abuse as defined under the Code. *Cf. Barker*, 2001 OK 94, ¶ 16 (noting Oklahoma protects internal whistleblowing for those "who establish a sufficient public policy violation"). Even if the Children's Code were at issue, Brackett would fail at the fifth element, because a statutory remedy already exists under the Code to protect the policy goals of reporting abuse under the Code—namely Okla. Stat. tit. 10A, § 1-2-101(B)(5). This statute protects abuse reporters against retaliation and specifically makes the retaliators liable for damages; it also allows for suits where a child who was the subject of the report is harmed. *Id.*; *cf. also Booth,* 2022 OK at ¶ 17, 504 P.3d at 1157 (finding failure at element five where the statutes at issue "provide for a private right of action or damages by a wronged customer"). Brackett has provided no argument as to why these statutory remedies are not adequate to protect the public policy goal of reporting abuse, were that goal implicated in this case.

## IV. Brackett's § 1983 Claim

### A. Brackett Does Not Assert Any Official-Capacity Claims against the Individual Defendants

The individual defendants argue that any claims brought in their official capacity are just another way of pleading a claim against the School District, and, therefore, such claims should be dismissed. (Dkt. No. 10 at 3—5; Dkt. No. 23 at 7–9.) In response, Brackett states that none of her claims against these defendants are in their official capacities. (Dkt. No. 19 at 3–4; Dkt. No. 32 at 8–9.) A review of the petition reveals no official-capacity claims. There is, therefore, nothing to dismiss here.

### B. Plaintiff Has Failed to State a *Monell* Claim against the School District

The School District, meanwhile, argues that Brackett has failed to state a § 1983 claim against it, because she fails to identify a municipal policy or custom that was the moving force behind the constitutional deprivation. (Dkt. No. 9 at 9.) Brackett responds that Superintendent Hogan had policymaking authority and was the moving force behind the constitutional violation.[11] (Dkt. No. 18 at 9–10.) The Court finds Plaintiff has failed to allege that Superintendent Hogan had the relevant final policymaking authority, and her claim fails on this basis.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). As such, to assert a § 1983 claim against the School District, Brackett must show "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy

---

[11] Brackett also argues that the School District ratified the constitutional violation by terminating her, but she does not explain how the School District's decision not to renew her employment could reasonably been seen as ratifying an illegal search of her phone.

or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).  The parties do not dispute that a School District employee violated Brackett's rights under the Fourth and Fourteenth Amendments when her property was searched.  Instead, the School District disputes that there was a municipal policy or custom alleged.

"A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).  "[I]f an official, who possesses final policymaking authority in a certain area, makes a decision—even if it is specific to a particular situation—that decision constitutes municipal policy for § 1983 purposes." *Randle v. City of Aurora,* 69 F.3d 441, 447 (10th Cir. 1995) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). *But see Bd. of Cnty. Comm'rs of Bryan Cnty v. Brown*, 520 U.S. 397, 405 ("To the extent that we have recognized a cause of action under § 1983 based on a single decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation.").

To determine whether an official is a final policymaker, courts consider "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision[s] are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle*, 69 F.3d at 448 (internal quotations omitted).  In certain circumstances, school superintendents may be

considered a final policymaker regarding certain decisions. *Kerns v. Indep. Sch. Dist. No. 31*, 984 F. Supp. 2d 1144, 1153 (N.D. Okla. 2013) (citing *J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 456–57 (10th Cir. 2010)). The relevant question is whether the superintendent has "'policymaking' authority, not 'decision making' authority." *Rubio v. Turner Unified Sch. Dist. No. 202*, 453 F. Supp. 2d 1295, 1302 (D. Kan. 2006) (collecting cases). Whether an official has "final policymaking authority" is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). If the superintendent's decision on a matter needs approval of another governing body, then the superintendent cannot be considered the final policymaker for that matter. *Young v. City of Idabel*, 721 F. App'x 789, 802-03 (10th Cir. 2018).[12]

Here, it is not impossible for Superintendent Hogan to have had final policymaking authority regarding the search of Brackett's phone, but Brackett has not alleged that such authority, in fact, existed. Under Oklahoma law, the governing body of a school district is its board of education. *See* Okla. Stat. tit. 70, § 5-106(A). The superintendent of a school district is "the executive officer of the board of education and the administrative head of the school system," and he "shall perform duties as the board directs." Okla. Stat. tit. 70, §§ 1-116, 5-106(A). The superintendent implements the written policies of the board and, in the absence of a policy for a circumstance, he "implements a policy sound in nature and functional for the management and operation of the district's business." *I.T.K. v. Mounds Pub. Sch.*, 2019 OK 59, ¶ 29, 451 P.3d 125, 140.

In the petition, Brackett merely alleges that Hogan was "employed by Defendant Collinsville Public Schools as its District Superintendent" and that Ellington told her she

---

[12] Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

16

did the search at the direction of him and three other individuals. (DKt. No. 2-2 ¶¶ 7, 51.) Brackett does not allege that the Collinsville board of education had provided Hogan policymaking authority in the area of teacher searches or teacher supervision, or otherwise placed in him a position to make the district's policy with regard to what happened to her. Brackett has failed to state a claim against the School District under 42 U.S.C. § 1983.

V.    **Plaintiff Has Stated a Claim for Civil Conspiracy**

Defendants argue Plaintiff's claim for civil conspiracy fails, because it relies on her inadequate claim for retaliation under the Children's Code. (Dkt. No. 9 at 8–9; Dkt. No. 10 at 12–13; Dkt. No. 23 at 20–21.) The individual defendants further argue that Plaintiff has failed adequately to allege an agreement among them. (Dkt. No. 10 at 13; Dkt. No. 23 at 21.)

Defendants read the petition too narrowly. Under Oklahoma law, "[a] civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." *Brock v. Thompson*, 1997 OK 127, ¶ 39, 948 P.2d 279, 294 (Okla. 1997). To state such a claim, the plaintiff must allege "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Schovanec v. Archdiocese of Okla. City*, 2008 OK 70, ¶ 46, 188 P.3d 158, 175 (internal quotation omitted). Here, it is true that Brackett alleges Defendants acted together in response to her complaints of Rigdon's abuse. (Dkt. No. 2-2 ¶ 95.) However, Brackett does not allege that the conspiracy was simply to violate the Children's Code. Instead, she alleges that the parties conspired to violate her rights "by engaging in activities, as set forth in this Petition . . . ." (*Id.*) This included the allegedly illegal search of her phone.

17

(*Id.* ¶¶ 49–52.)  While the remainder of the allegations in the petition do not state a claim under the Children's Code, they plausibly support a claim that the named defendants were upset regarding Brackett's reports of abuse and agreed together to search her property in response.  There remains a claim in this case that the search was unlawful under federal and state law.  Brackett has adequately alleged a claim for civil conspiracy.

## VI.  Other Issues

### A.  Immunity under the Governmental Tort Claims Act

The individual defendants assert that the claims against them "arguably" are based on acts that occurred within their scope of employment and, to the "extent" that is alleged, they are immune under the OGTCA.  (Dkt. No. 10 at 5–7; Dkt. No. 23 at 10–12.)  Defendants base this argument entirely on the fact that their job titles at the School District are listed in the petition.  (Dkt. No. 10 at 5–6; Dkt. No. 23 at 10–11.)

The OGTCA provides that tort claims against a political subdivision shall not name as a defendant "an employee . . . of a political subdivision . . . acting within the scope of employment . . . ."  Okla. Stat. tit. 51, § 153(C); *see also Earles v. Cleveland*, 418 F. Supp. 3d 879, 891 (W.D. Okla. 2019) (tort claims "cannot name any state employee as a defendant unless the employee is alleged to have been acting outside the scope of his employment"), *aff'd on other grounds*, 825 F. App'x 544 (10th Cir. 2020).  The OGTCA defines "scope of employment" as "performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority . . . ."  Okla. Stat. tit. 51, § 152(13).  "An act of the employee is not in the scope of employment if the employee acted maliciously or in bad faith." *Pellegrino v. State ex rel. Cameron Univ.*, 2003 OK 2, ¶ 4, 63 P.3d 535, 537.  "Except in cases where only one reasonable conclusion can be drawn, the question of whether an employee has

18

acted within the scope of employment at any given time is a question for the trier of fact." *Tuffy's, Inc. v. City of Okla. City*, 2009 OK 4, ¶ 8, 212 P.3d 1158, 1163.

Here, the remaining claims against the some or all the individual defendants include unconstitutional search and seizure and civil conspiracy to commit this unlawful act in retaliation for Brackett's internal reports of student abuse. The details of the parties' alleged acts are set forth in the Factual Background above. As currently alleged, the Court cannot say that the only reasonable conclusion to be drawn is that the individual defendants were acting in good faith and within their duties when they committed these alleged acts. The motion to dismiss based on the OGTCA is denied.

### B.   Punitive Damages

The School District points out that Brackett cannot recover punitive damages from it under either federal or state law, and Brackett agrees. (Dkt. No. 9 at 10–11; Dkt. No. 18 at 12.) The demand for punitive damages in the petition against the School District will be stricken.[13]

### *Conclusion*

IT IS THEREFORE ORDERED that *Defendant School District's Partial Motion to Dismiss* (Dkt. No. 9) is GRANTED IN PART and DENIED IN PART; *Individual Defendants Boomer, Johns, Hogan, and Ellington's Partial Motion to Dismiss* (Dkt. No. 10) is GRANTED IN PART and DENIED IN PART; and *Individual Defendants Crutchfield and Duncan's Partial Motion to Dismiss* (Dkt. No. 23) is GRANTED IN PART and DENIED IN PART. Plaintiff's claims under the Children's Code and *Burk v. K-Mart*

---

[13] Punitive damages are a type of damages, not an underlying claim for relief. *See Huggins v. Four Seasons Nursing Ctrs., Inc.*, No. 07-CV-0396-CVE-PJC, 2007 WL 3113429, at *2 (N.D. Okla. Oct. 22, 2007). The Court, therefore, will not "dismiss claims" for punitive damages.

*Corp* are DISMISSED WITHOUT PREJUDICE. Plaintiff's claim against Defendant Collinsville Public Schools under 42 U.S.C. § 1983 is DISMISSED WITHOUT PREJUDICE. The following claims remain in the case: (1) Plaintiff's claims under 42 U.S.C. § 1983 against Defendants Sarah Ellington, Jeremy Hogan, Ashley Boomer, Julia Crutchfield, and Jacqueline Johns; (2) Plaintiff's claims under Okla. Const. art. 2, § 30, against Defendants Collinsville Public Schools, Ellington, Hogan, Boomer, Crutchfield, and Johns; and (3) Plaintiff's civil conspiracy claim against all defendants.

IT IS FURTHER ORDERED that any demand for punitive damages against Defendant Collinsville Public Schools is STRICKEN.

ORDERED this 3rd day of February, 2026.

_____
SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT